July 14, 1993 [NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-2183

SHERMAN MILLER,

Plaintiff, Appellant,

v.

DEPARTMENT OF CORRECTION, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Selya, Cyr and Boudin,
Circuit Judges.

Sherman Miller on brief pro se.

Scott Harshbarger, Attorney General, and Timothy A. Mullen,

Assistant Attorney General, on brief for appellees.

Per Curiam. Pro se plaintiff Sherman Miller appeals
Per Curiam.

from a district court judgment for the defendants in this 42

U.S.C. 1983 action. For the reasons discussed below, we

affirm.

I

Miller is sixty-five years old. For most of the past

fifteen years, he has been a resident of the Treatment Center for

Sexually Dangerous Persons located in Bridgewater, Massachusetts

(hereinafter: "Treatment Center" or "BTC"). Following a 1978

conviction for rape, Miller was committed to the BTC pursuant to

a Suffolk Superior Court order adjudicating him a Sexually

Dangerous Person ("SDP") pursuant to M.G.L. c. 123A, 6 (re-

pealed) and directing that he "be voluntarily committed to the

Treatment Center . . . ." (emphasis supplied). In 1984, Miller

commenced this civil rights action. The amended complaint sought

declaratory and injunctive relief and damages for alleged consti-

tutional deprivations attending his confinement at the BTC. All

named defendants are state officials formerly responsible for

operations at the BTC.1 Although the amended complaint asserted

seven claims, only two are implicated by this appeal. Miller's

first claim alleged that the defendants violated his constitu-

tional right of access to the courts by maintaining an inadequate

1The defendants are former Department of Corrections Commis-
sioner Michael Fair, Charles Gaughan (former Superintendent of
the Massachusetts Correctional Institution at Bridgewater), James
Callahan (former Commissioner of the Department of Mental
Health), Richard Boucher (former Administrator of the BTC) and
Mildred Gil (law librarian at the BTC).

2

law library and restricting library access. The other surviving

claim alleged that the defendants violated Miller's constitution-

al right to rehabilitative treatment. Miller alleged that the

defendants failed to develop an individual treatment plan ("ITP")

for him although he believed such plans had been developed for

other BTC patients and that the denial of an ITP violated his

right to due process and equal protection under the Fourteenth

Amendment.2 He sought injunctive relief requiring defendants to

develop an ITP which would afford him a realistic opportunity to

improve his mental condition, and requiring defendants to afford

him adequate access to the BTC law library.

On December 10, 1985, the district court granted a

preliminary injunction on Miller's "access to the courts" claim.

The order required the defendants to obtain certain additional

volumes for the law library and to ensure that Miller receive

reasonable photocopying services. Miller's criminal sentence

expired on May 8, 1989. No significant judicial proceedings took

place thereafter until the case was called for trial in January

1991. Relying on the expiration of his criminal sentence, Miller

sought release from the BTC by instituting a state-court habeas

corpus proceeding. On March 20, 1991, the superior court ruled

that Miller had been involuntarily committed to the Treatment

Center and, therefore, was not entitled to release until such

time as his adjudication as a SDP was revoked under M.G.L. c.

2Miller alleged that the defendants discriminated against
him because of his unique "voluntary" commitment status and that
the BTC maintained that Miller's right to participate in its
programs was inferior to that of involuntarily committed BTC
patients.

3

123A, 9.3 Thus, but for his status as a SDP, Miller would be

a free man. Nevertheless, he has never submitted an administra-

tive request for release or reclassification.

Miller's 1983 action was called for trial in January

1991. Both sides sought a continuance; the BTC had lost its case

file and Miller required further discovery. The district judge

continued the trial to April but warned that belated dispositive

motions would not be allowed to delay the trial further. Four

days before the rescheduled trial, defendants filed a motion to

dismiss or for summary judgment, based on this court's March 22,

1991 decision in Langton v. Johnston, 928 F.2d 1206 (1st Cir.

1991). Langton resolved an appeal from a class action, Bruder v.

Johnston, brought on behalf of all patients civilly committed to

the BTC.4 The Langton plaintiffs sought to have the defendants

all of them state officials responsible for operations at the

BTC held in contempt of certain consent decrees requiring the

establishment of various therapeutic, educational, and vocational

programs at the BTC. See generally Williams v. Lesiak, 822 F.2d

1223 (1st Cir. 1987) (describing consent decrees). Like Miller,

the Langton plaintiffs had raised an inadequate treatment claim

that alleged, inter alia, that the defendants had failed to

3The superior court ruling was based on the statements made
by the committing judge during the course of the SDP hearing, as
well as Miller's own conduct. The Massachusetts Appeals Court
affirmed. See Miller v. Tink, 33 Mass. App. Ct. 1103 (1992),

further rev. denied, 413 Mass. 1106 (1992).

4We refer to Bruder and Langton interchangeably. We note

that Miller's 1983 action and Bruder were pending before

different district judges at roughly the same time, although the
Bruder suit was filed two years after Miller's suit and the

Miller case was not resolved until almost two years after Bruder

was decided. Miller unsuccessfully filed a motion to intervene
as a class representative in Bruder. See also infra note 14.

4

provide treatment reasonably designed to bring about the pa-

tients' recovery. See 928 F.2d at 1212. Our decision in Langton

upheld the district court's ruling that the defendants were not

in contempt of the consent decrees but rather had achieved

substantial compliance with those decrees notwithstanding the

fact that the ITPs of many patients were not being fully imple-

mented. We also observed that the BTC had a "current and compre-

hensive law library." See id. at 1213, 1216, 1220-23. The

defendants contended that Langton barred Miller's claims under

the doctrine of res judicata or collateral estoppel. Miller

moved to strike defendants' dispositive motion.5

When the case was called for trial, defendants' motion

to dismiss/for summary judgment and Miller's motions to strike

and compel discovery remained pending. The district court

initially told Miller that he would not have to file a response

to defendants' motion and instructed defendants' counsel to

assert their legal arguments in the context of a motion for

directed verdict. Miller, however, was not prepared for trial.

He had not subpoenaed any witnesses, being uncertain as to how

the court would proceed on the pending motions.6 Loath to delay

the resolution of Miller's claims any longer, the district court

5Shortly before defendants filed their motion to dismiss/for
summary judgment, Miller moved to compel discovery and for a
judgment of contempt. He sought to compel Michael Stevens, the
Chairman of the BTC's Reintegration Review Board ("RRB"), to
complete his deposition and produce documents. Miller's motion
to strike argued that defendants improperly moved for summary
judgment before discovery was completed.

6Miller complained that he had been unable to complete the
deposition of Michael Stevens, Chairman of the BTC's RRB. Miller
hoped to elicit Stevens' admission that Miller's treatment was
not being based on professional judgment under Youngberg v.

Romeo, 457 U.S. 307 (1982).

5

expressed a preference for proceeding to trial. But after

hearing defendants' arguments, the court expressed some uncer-

tainty as to whether the case would be tried or resolved on

defendants' motion.7 The court recessed to allow Miller to

prepare a subpoena for Stevens, as well as a witness list and a

proffer indicating how Miller's evidence might defeat defendants'

Langton/Bruder defense. After the recess, Miller submitted a

witness list identifying six witnesses on his "access to the

courts" claim and seven witnesses on his inadequate treatment

claim.8 He argued that Bruder did not bar these claims because

(1) Bruder was not decided on constitutional grounds; (2) Miller

had not been a party to Bruder, in part due to his alleged

voluntary commitment status; (3) many of the issues Miller sought

7The district court explained to Miller, "If you don't have
a proffer of evidence that would establish if credited that there
is a cause of action remaining in the face of the legal arguments
the defendant is asserting, then whether we do it as a trial or

do it as a motion for a summary judgment, it's time to end the

case . . . ." (emphasis added).

8Miller's proffer indicated that he expected two members of
the BTC's Reintegration Review Board Dr. Mark Sokol and
Michael Stevens to identify the treatments recommended for
Miller that had not been provided. Miller further indicated that
he wished to question Dr. Albert Jurgela, Director of Clinical
Services, to find out why various recommended treatments had not
been provided. Miller complained that the BTC refused to give
him clozapine a drug Miller had taken for six or seven years
prior to his incarceration and which allegedly allowed him to
function normally in society even though the BTC's RRB specif-
ically recommended it. He implied that his only hope of release
might rest on securing clozapine therapy. Miller wanted to call
Dr. Daniel Kreigman and Dr. Martin Miller to inquire why the BTC
was not giving him clozapine. He expressed the hope that another
witness, Dr. Guy Seymour, would testify that Miller suffered from
schizophrenia, thus justifying the use of clozapine. (continued)
In support of his "access to the courts" claim, Miller
sought to prove that certain restrictions on his movement within
the law library violated the constitutional right of access to
the courts of inmates he was assisting in his capacity as an
appointed research assistant.

6

to raise concerning his treatment arose after Bruder was decided,

and (4) Bruder merely determined that the state was not required

to implement all treatments recommended in a particular SDP's

ITP, it did not decide what the state was required to provide to

a SDP, such as Miller, whose criminal sentence had expired.

Defendants reiterated their argument that Langton/Bruder barred

Miller's remaining claims.

The district court concluded that the case could be

resolved by affording Miller an opportunity to file affidavits

and memoranda in opposition to defendants' arguments. The court

adjourned the "trial" after one day, allowing Miller leave to

submit such filings. Thereafter, Miller filed a number of

submissions in support of his claims. With respect to his

inadequate treatment claim, Miller averred that he had been

adjudicated a SDP and committed to the BTC in 1979, that the

BTC's RRB had formulated an extensive treatment plan for him on

November 1, 1989, but that he had "not been afforded one of the

behavioral and pharmacological treatment modalities recommended

by the [RRB]." He reiterated his complaint that he had not been

treated with clozapine, notwithstanding the RRB's recommendation.

On June 11, 1991, the district court issued a memoran-

dum of decision denying relief on Miller's inadequate treatment

claim. The court ruled that it was not necessary to decide

whether Langton/Bruder barred the claim under the doctrines of

res judicata and collateral estoppel. The court ruled instead

that Langton/Bruder precluded relief under the doctrine of stare

decisis. Noting that Miller had based his inadequate treatment

7

claim largely on the fact that he had not been given clozapine as

recommended by the RRB, the court reasoned:

In light of the recognition by the courts in
Bruder and Langton that patients were not

receiving all of the treatment recommended in
their individual treatment plans, . . . pla-
intiff has failed to demonstrate a genuine

issue of material fact on the claim of con-

stitutionally inadequate treatment . . . [and

the] defendants are entitled to judgment as a
matter of law. (Emphasis supplied.)

The court awarded Miller partial relief on his "access

to the courts" claim,9 but held that he had not stated an ac-

tionable claim for denial of access to the courts on behalf of

his fellow patients because he failed to allege that those

patients had no avenue of access to the courts except through

Miller.

Miller filed a motion for partial reconsideration,

arguing that the district court erred in construing his inade-

quate treatment claim as similar to that raised by the plaintiffs

in Langton/Bruder. Relying on his May 13, 1991 affidavit, Miller

argued that, unlike the Langton plaintiffs, he was not complain-

ing that he had not received all the treatments that had been

recommended for him. Rather, Miller's complaint was that he had

not received any of the behavioral and pharmacological treatment

modalities that had been recommended for him by the RRB in 1989.

Miller argued that simply because the BTC was not able to imple-

ment all of the programs recommended in each patient's ITP did

not mean that the BTC had no obligation to implement some of the

9The court issued a judgment declaring that as of December
10, 1985, the BTC law library was constitutionally inadequate.
Miller was awarded $500 for attorney fees incurred in enforcing
the district court's December 10, 1985 preliminary injunction.

8

programs repeatedly recommended for him. Miller further averred

that his group therapist and another staff person were recently

"bumped," which would leave him without treatment.

The defendants filed an opposition which included an

affidavit from Dr. Jurgela and copies of the RRB's reports on

Miller's 11/1/89 and 7/25/90 status reviews.10 Dr. Jurgela

attested that Miller's therapist continued to provide group

therapy to Miller notwithstanding the fact that she had been

"bumped," and that Miller also received treatment in the form of

weekly "house meetings" led by another staff clinician. Dr.

Jurgela acknowledged, however, that the current RRB report recom-

mended that Miller receive individual therapy, personality

testing, general behavioral and plethysmographic assessments,

covert conditioning, relapse prevention, and anger and depression

management, but that Miller had not received any of these assess-

ments or treatments.11 He also acknowledged that a psychophar-

macological consultation had been recommended for Miller, presum-

ably a reference to the recommended clozapine therapy. The RRB

reports confirmed Miller's allegation that the RRB had recommend-

ed a trial use of clozapine in 1989 and that, as of July 1990, he

had received neither clozapine nor the other recommended services

noted immediately above. The 1989 RRB report concluded that

Miller remained a SDP whose prognosis was poor. The 1990 RRB

report noted that services might be lacking for Miller and if

10Under the consent decree, the RRB is required to evaluate
each patient, on an annual basis, to determine the progress of
therapy and the advisability of permitting the patient to reenter
the community on a limited basis. See Langton, 928 F.2d at 1210.

11Dr. Jurgela noted that Department of Mental Health ("DMH")
policy prohibited the use of plethysmography at any DMH facility.

9

that were the case, as opposed to Miller simply resisting servic-

es that had been offered, "such conditions should be corrected as

soon as possible." Miller responded to the defendants' opposi-

tion, arguing that defendants' evidence established that of the

ten treatment modalities that had been recommended by the RRB in

1989, he had received only one (group therapy).

The district court rejected Miller's contentions on the

ground that Miller had "not demonstrated a genuine issue of

material fact on the adequacy of treatment claim." The court

reiterated that "the Treatment Center is not obligated to imple-

ment the [ITP] drawn up by the [RRB] in all its details" and

found that Miller's claim that he had "not been afforded one of

the behavioral and pharmacological treatment modalities recom-

mended by the [RRB]" in 1989 was "a factual assertion not clearly

supported by the ambiguous language in" Miller's affidavit

because Miller had failed to identify a treatment other than

clozapine that he had not received. The court further found that

Miller's claim that he was no longer receiving any treatment

since certain staff members had been "bump[ed]" merely assert-

ed "sketchy facts and unsupported conclusions" which failed to

comply with Fed. R. Civ. P. 56(e). The court denied Miller's

motion for partial reconsideration and his amended motion for

partial reconsideration.

Miller then filed other postjudgment motions: to

supplement the pleadings, reopen the case, and amend the pleadi-

ngs to conform to the facts set forth in Miller's September 23,

1991 affidavit ("Supplementary Affidavit"). In the first motion,

Miller argued that further reconsideration was warranted because

10

the court had failed to apprise him of the requirements of Rule

56(e). Miller's Supplementary Affidavit spelled out each recom-

mended treatment with which he had not been provided since

1986.12 The court declined further reconsideration, asserting

that its June 11, 1991 decision was not based on defendants'

motion for summary judgment, therefore Miller's alleged unaware-

ness of the requirements of Rule 56(e) was irrelevant. The court

further found that Miller's Supplementary Affidavit disclosed no

set of facts that might entitle him to relief and that amendment

of the pleadings following "trial" was not in the interests of

justice. The court held that Miller's Supplementary Affidavit

was not part of the record. Miller's motions were denied and

this appeal followed.

II

The district court orders disposing of Miller's postju-

dgment motions are reviewable for "abuse of discretion." See

Desenne v. Jamestown Boat Yard, 968 F.2d 1388, 1392 (1st Cir.

1992)(deci-sion on Rule 59(e) motion for reconsideration reviewed

for abuse of discretion); Rodriguez-Antuna v. Chase Manhattan

Bank Corporation, 871 F.2d 1, 3 (1st Cir. 1989)(denials of Rule

60(b) motions may be reversed only for abuse of discretion). We

find that the district court acted well within its discretion,

particularly in view of the extreme tardiness of Miller's re-

quests for relief in an action commenced in 1984. Moreover,

12Among these were treatments for anger, depression and
self-control management, personality testing, relapse prevention
treatment and plethysmographic assessment. But cf. note 11,

supra.

11

Miller misapprehends the district court ruling on his inadequate

treatment claim. The district court correctly ruled that Miller

failed to provide evidentiary support, or even a sufficient

proffer of evidence, to support the claim of inadequate treat-

ment, since he failed to show that the claim was not precluded

under the doctrine of stare decisis by Langton/Bruder. The

district court arrived at its decision on the basis of Miller's

ambiguous affidavit attesting that "he had 'not been afforded one

of the behavioral and pharmacological treatment modalities recom-

mended by the [RRB]' . . . ." Memorandum of August 26, 1991, at

p. 2. The district court supportably construed the quoted

language as a reference to the BTC's failure to administer

clozapine, as recommended by the RRB. Id. at 4. Relying on

Langton, the district court ruled that, without more, the BTC's

mere failure to provide this one recommended treatment was

insufficient to demonstrate a genuine issue of material fact.

Id. at pp. 3-4. As concerns the alleged "bumping" of Miller's

"therapists," see id. at 4, the district court correctly noted

that the term "bumping" is ambiguous and conclusory. Id. at 4-5.

Thus, the district court's disposition of Miller's motions for

reconsideration and for relief from judgment, see id. at pp. 5-6,

constituted no abuse of its discretion.

Thereafter, Miller filed additional postjudgment

motions. See Memorandum of November 4, 1991. The district

court denied Miller's motion to amend the pleadings to conform to

his Supplementary Affidavit. See Fed. R. Civ. P. 15(a),(b).

Here, we believe the district court erred in holding that Miller-

's "Supplementary Affidavit reveal[ed] no set of facts that would

12

entitle plaintiff to relief under the law as stated in the

Memorandum and Order of June 11, 1991." Id. at 3. The June 11

order relied on Langton/Bruder, but the Supplementary Affidavit

filed by Miller materially altered the record evidence tendered

in support of his inadequate treatment claim by relating numerous

other procedures and therapies recommended for Miller by the RRB

which were not afforded him by the BTC. In our view, the Supple-

mentary Affidavit may well have raised a genuine issue of materi-

al fact as to whether Miller's constitutional claim based on

inadequate treatment was actionable. Nevertheless, the district

court did not abuse its discretion. This court determined in

Langton that it was unnecessary, indeed inadvisable, for the

district court to address the constitutional claim to adequate

treatment "because the existing consent decrees 'require[d] the

provision of adequate treatment for [BTC] patients' at a level

beyond that required by any applicable constitutional minima."

Langton, 928 F.2d at 1217. And so it is here. Thus, although

Miller attempted to assert a constitutional right to treatment

based on professional judgment under Youngberg v. Romeo, 457 U.S.

307, 323 (1982), and such cases as Ohlinger v. Watson, 652 F.2d

775, 777 (9th Cir. 1981) (holding that sex offenders committed to

indeterminate life sentences have a constitutional right to

treatment providing a realistic opportunity for cure or improve-

ment), and Cameron v. Tomes, 783 F. Supp. 1511, 1516 (D. Mass.

1992) (holding that involuntarily committed SDP at BTC has

constitutional right to treatment based on professional judg-

13

ment), modified, slip op. 92-1343 (1st Cir., March 31, 1993),13

we think the district court did not abuse its discretion by

dismissing Miller's postjudgment motion to amend the pleadings so

late in the day.

III

Miller further argues that the district court erred in

holding that Langton bars his inadequate treatment claim because

he was not a party to Langton. Nevertheless, and notwithstanding

the dispute over whether Miller was voluntarily or involuntarily

committed to the BTC, see supra note 3 & accompanying text, it is

clear that he is among the plaintiff class in Langton/Bruder,

which is defined as "all individuals who are presently or in the

future will be civilly committed to the Treatment Center." See

Bruder, slip op. at p. 43.14 Moreover, both Miller and the

Bruder plaintiffs charged that the treatment received at the BTC

was not constitutionally adequate.

Finally, even if Miller's rights under the applicable

consent decree were violated, the appropriate vehicle for their

enforcement is not a section 1983 action but an action for

contempt (like the one filed by the Bruder plaintiffs two years

after Miller commenced this action). See, e.g., DeGidio v. Pung,

13We decided that Cameron's claim was a challenge to the
conditions of confinement. See slip op. at pp. 12-13. Thus,

whether SDPs have a constitutional right to treatment remains an
open question in this circuit. See slip op. at 11-12; Knight v.

Mills, 836 F.2d 659, 668 & n.13 (1st Cir. 1987).

14Miller's motion to intervene in Bruder sought intervention

as a named class representative. Its denial imported no finding
that Miller was not adequately represented by the plaintiff
class.

14

920 F.2d 525, 534 (8th Cir. 1990); Green v. McKaskle, 788 F.2d

1116, 1123 (5th Cir. 1986). Cf. Welch v. Spangler, 939 F.2d 570,

572 (8th Cir. 1991). Any other rule would tend to discourage

governmental authorities from entering into consent decrees in

public law litigation, encourage the splintering of civil rights

claims on an individual basis, and promote disrespect for judi-

cial decrees duly entered following careful proactive review of

the often complex mix of individual and institutional consider-

ations involved in such litigation.

IV

Miller next contends that the district court erred in

holding that he lacked standing to assert a constitutional right

of access to the courts on the part of certain other BTC patients

whom he assisted. Before the district court, Miller alleged that

he had been appointed as the legal research assistant for minimum

privilege and segregation patients on June 21, 1989 (five years

after he commenced this action). His responsibilities included

instructing such patients on the procedure for requesting legal

materials, assisting their preparation of legal pleadings, and

obtaining and returning books for patients. On March 31, 1991

(approximately two weeks before trial), the Department of Correc-

tions ("DOC") imposed certain restrictions which allegedly

prevented Miller from performing his duties as legal research

assistant. As of that date, Miller was prohibited from obtaining

books from the shelves of the law library. As a result, he was

no longer able to Shepardize cases nor to procure cases cited in

texts. In addition, Miller had to request books in advance so

that some other person could retrieve them. Miller alleged that

15

books requested by him often were not produced when Miller and

the patients arrived at the library. Other limitations allegedly

impinged on Miller's ability to communicate with the patients he

was supposed to assist.15 Miller alleged that these restric-

tions foreclosed meaningful legal research assistance to other

patients and that he was the only legal assistance afforded to

BTC.

The district court rejected the right of access claim

because Miller had not pleaded a third party claim and failed to

show that the patients he had been assisting had no other avenue

of relief. We affirm the dismissal of the third party claim; it

came too late. Cf. Andrews v. Bechtel Power Corp., 780 F.2d 124,

139 (1st Cir. 1985) (upholding denial of motion to amend com-

plaint after commencement of trial, where complaint had been

filed seven years earlier).

Affirmed; no costs.

15For example, Miller was required to sit at one table while
the patients he assisted sat at separate tables in the library.
Miller also claimed that often he was not notified by corrections
officers that his assistance had been requested by patients.

16